Good morning. May it please the court. Teresa DeMonte on behalf of the landowner plaintiffs present with me virtually are my colleagues Michael Hellgren and Curtis Izaki. I'd like to reserve five minutes of my time for rebuttal. All right, we'll be the only person speaking then? You're not? They're not. Okay, all right. We're at virtual council table. Okay, thank you. Thank you. Go ahead. The morning of July 30th, Garrison Commander Lieutenant Colonel Jarrett Matthews issued a ceasefire if wind speeds rose or fires broke out. It is undisputed that his conditions for a ceasefire were met, yet his restrictions went unheeded causing the Range 12 fire which escaped the installation and square miles of adjoining properties, including I kind of want to get a little perspective on this. I think we know what the facts are here, but it's an FTCA case, right? Correct. And we're at 12 B one. That's right. And so so I mean, primarily, that will be our focus. And then I know you have other things that have to do with discovery, etc. On the 12 B one, my question just logistically on a on a federal courts claims that you don't have a right to a jury trial, right? Correct. Okay. And so what the district so whatever happens here, the district court is going to be deciding this, right? That's correct. All right. So, um, you were allowed to is, I guess the point that causes me the most concern and I'm going to ask the other side about it, um, that the commander, if we accept your argument that the base commander issued a clear mandatory set of directives on the day of fire, can you clarify which individual you contend acted negligently and in violation of a mandatory instruction was home in the relevant individual who lacked discretion for purposes of this analysis? Or can you clarify that for me? Yes, Your Honor. If if and as the record reflects with the facts viewed in the plaintiff's favor, as is required, he issued a mandatory training restriction that bound the be any actor who violated his restriction, including but not limited to Mr Holman. And in fact, the soldier who shot the shot in violation of those restrictions. And it's important to remember that here training could only go forward as specifically authorized. The default that was was that training wouldn't happen unless the commander authorized it. And the scope of that because because I'm not sure why why, uh, Commander Matthews issued the two, um, condition. He set the two conditions. And if we construe the facts in your favor, those were indeed conditions. The training couldn't go forward if either of those were met, and both of them were met. But the record also shows if we look at his second declaration that he retained the authority over the course of that day, and he got periodic updates. So why was it up to home? Well, Your Honor, it's actually not clear that he was given updates as he requested or that they were appropriate. There's a lot that we don't know. We were denied deposition discovery. And in his declaration, Holman Matthews states that he's reviewed his witness statement, and it's correct. He never backs away from his mandatory. It's not your counsel. I'm not arguing with you, but I do have a specific set of questions. Okay, so my question went to his declaration. That was two years later. And in that declaration, I think he he is very clear that he retained authority not only on or off switch at the beginning of the day, but throughout the course of the day, and then he got update, which is why. And that's just a yes or no. Do you read that declaration the same way? I don't read it the same way, or rather, there's there's a caveat that I would add. He does say that before you get to your caveat, which I think is going to be for the deck, the witness statement that he made a month after the fire. I'm just looking at the declaration two years later. How do you read that differently? And the salient points for purposes of my question or whether Commander Matthews retained authority and that he got updates over the course of the day. Do you read that declaration the same way? Indifferently, he does say that. Okay, so that's why these are not trick questions. We're trying to get our arms around a complicated set of facts, but that's why it seems to me to be very problematic. And this is for opposing counsel's benefit as well. That a month after the fire, his statement was that he had these same two conditions. And I think that it's a little fuzzier about who's got the authority. He's got the ultimate authority. Certainly that day, although the question is during the course of the day, but but the salient disconnect for me is that a month after the accident, he said that post fire, he came to understand that the two conditions had been met only post fire. So the inconsistency is whether he was getting those updates over the course of the day. Judge Kristen, you hit the nail on the head, and that was the caveat that I was going to add is that in his witness statement, of course he retained ultimate authority. He gave a mandatory directive at the beginning of the day. If two conditions are met, training stops. He didn't know that those conditions were met is the inference to be drawn from this. Hold on, hold on. Just slow down a bit. That's the inference. If you look at the statement a month later, right now, you're talking about the statement a month. OK, OK, go ahead. And his subsequent declaration actually isn't inconsistent with that. It's very carefully and craftily worded, but it doesn't negate the idea that, yes, he had ultimate authority. Had he gotten an update that there were incoming nukes or... Well, wait a minute, wait a minute. When you say it's not inconsistent, I'm looking, he says he got, in the second statement, he says he got periodic updates that day. Yes, but... It's paragraph 33 ER 473. I've periodically received updates about wind speeds, temperature and so forth.  He doesn't say that he got updates that the wind speeds were at or over 10 miles per hour, or that he got an update that smaller fires had broken up on the range. So that's not... Well, but he says he's got, he says it's not inconsistent. He says he got updates and at the very end of this page, concluding on to the other one, 473, 474, this is where he makes clear that he exercised his discretionary authority to continue training throughout the day. I mean, those back-to-back. And that strikes me as a very significant, I don't want to use all your time, but it struck me as a very significant difference. And it gets back to Judge Callahan's point. If we look at the declaration, just the declaration executed two days, two years later, it doesn't seem to me to matter what range officer Holman knew or didn't know because the information was going back to the commander and he's got the authority and he doesn't deny receiving the updates. No, but he doesn't testify as to what the updates are. And at a minimum, there's a disputed factual issue. Right after the fire, he said he had no idea that wind speeds and fires had come to pass. I mean, he says that it's excerpted, it's quoted verbatim in our brief, at reply brief at pages 8 and 9 and in the record at ER 806. He says, when asked if the unit complied with restrictions, he says, I don't believe they adhered to my specific restrictions. I don't think you realize, but you're kind of yelling. Oh, I'm sorry. I apologize. Usually I tell people to, you know, to speak up, but I'm going to tell you, you can dial it back a bit because we can't hear you really well. I apologize. You're using your outside voice. I'm projecting a little bit too loudly. He says, I don't know who in the training unit, you know, was aware of these restrictions and who made the decision to continue training when the conditions were met to stop training. Let's assume, let's assume that there is a disputed issue of fact here for I'm not sure. I think that that whole area is your strongest, in my view, and we haven't consulted on this. So I know you cite JBLM 350-2 and you cite something else. I don't find those as strong, but if we're talking about who was in control, was it discretionary? Was it a command or all of that? Let's assume that there are disputed issues here and it's a 12B1. If we say, okay, it goes back. So still the same judge then would decide what discovery on that and would still have, then would have a hearing and would have to resolve those factual differences. And if the judge resolved those factual differences and said that the exception applied, then we're at a different place, right? But right now it's just being resolved on 12B1. That's right. So if there are disputed facts, then what would go back is then to, for the judge to resolve those disputed facts. And depending on how they're resolved, if they're resolved that it was a discretionary decision at end, the exception would still apply, right? But it would be based on more evidence. It would be based on calling witnesses or any number of things, right? Exactly. And that's critical because here the government and its attempt to meet its burden relied heavily on legal conclusions and the administrative investigation report, as well as on witness declarations, which the plaintiffs never had the opportunity to test or probe. No, I mean, if I were to make your best argument, we don't know why there's, if there are inconsistencies, we don't know why they occur, what happened in intervening time, I also noticed that Judge Bastian said something about that. What the commander said was not a direct command and that it was just something kind of moving with something along those lines. I noticed the government's not relying on that there. And I'm going to ask them, my understanding, and I have military and my family, that one of the things that they always say in the military, if someone hires something, you don't ask why. So I found that conclusion a little bit surprising. Well, I agree. I think we all have a sense that in the military, the chain of command is absolutely critical. And moreover, under the training unit SOP, commander Matthews had the authority to impose restrictions and to authorize training only subject to those restrictions and to have those restrictions be followed. And as you said, If the range guy, his name's Holman, I guess, is Holman the range guy? Hypothetically, if the commander had said nothing, then would you concede that your ROC is a little harder to push uphill, that it's not a discretionary act because the range person was, apparently these units were about to deploy, they needed to be ready and absent, if he was only dealing without what the commander said. Is your argument weaker? No, if the commander had said nothing under the training unit SOP, live fire exercises couldn't go forward at all because it's undisputed that the decision went to the commander and training, the default... Nothing new, hypothetically. Hypothetically, if it were just Holman and he was following those directives, isn't your, and you take everything about the commander out that didn't exist. Isn't your case weaker? Isn't it stronger that it was a discretionary act? If Holman himself were the authorized decision maker? Yes. Yes. That's counterfactual. You know, if you admit it, you're not losing, per se. I agree. I agree. You have to deal with the hypothetical. Well, there's actually a caveat to that too. If Holman were the authorized decision maker, we actually need discovery on the factors that were to be considered in the live fire risk assessment and what they are, if you look at ER 473, Matthews testifies that he considered conditions like wind and, and other safety considerations. It's not clear that under the policy, the decision maker was authorized to consider anything other than safety. And the policy itself at the training unit SOP and ER 640 said there's additional information on how the assessment is to be conducted. And it's not clear that was a permissible factor. Time for rebuttal. You've pretty much taken up most of your time. Yeah. I'll reserve the rest of my time. You gave me a little extra, but do either of my colleagues want to ask questions of Ms. DeMonte now, or do you want to? Not at this point. Okay. I'll give you, I'll, I'll decide how much time I, you know, I'll give you three minutes for rebuttal, even though, cause we've taken up some of your time. So, all right, Mr. Sandberg, why don't you state your appearance and go for it. Good morning, ma'am. Please. The court, Jeff Sandberg for the United States. Um, are you ready for me to proceed? I, well, we'll see how long it takes before you get a question. Go for it. Sure. Well, I, I, I saw it. Judge Rake. I think that you are, are, are right in focusing on the issue of, you know, Colonel Matthew's alleged restrictions and you are right. And looking at this through the 12B1 lens. And if I may, I want to give just a little bit of context for what was. I'm having, hold on. Hold on. I'm having a really hard time understanding what you're saying. It might be that you're talking too quickly. It might be that you're too far away, but I'm missing about half of it. So could you come closer? My apologies. I'll try a little slower. So the government hadn't been categorically opposed to having fact finding by the district court here. Um, but we, when we filed our motion to dismiss, we were, um, up against some fairly abusive, um, discovery requests from the other side, document requests for five years of training records, police logs, fire logs, um, they wanted to take eight hour depositions of, uh, dozens of people and they tried to, sorry. You were opposed to any depositions, right? Not initially, but when it became clear that we just weren't seeing eye to eye on what the scope of jurisdictional discovery would be, we wanted the judge to, uh, handle any questioning that was going to happen of any witnesses in the case, and so we said, the judge to handle any questions, excuse me, what, what? Yes. If we, our position is that if there were, um, disputed issues of fact here that required, say, a credibility finding to be made, that the appropriate course would be for the judge to hold an evidentiary hearing as is permitted under rule 12B1 and to make findings. Um, as it happens, we think the district court did make a factual finding here and based on existing record. And we think that that is, was not in a clear error and that the district court did not abuse its discretion by choosing not to have an evidentiary hearing. What factual finding are you talking about now? Um, I'm talking about a finding on page, I believe it's page 15 of the excerpt of record, which is the district court decision. Um, the record shows that Lieutenant Colonel Matthews alleged oral orders were ambiguous and uncommunicated and essentially did not rise to the level of an order, a mandatory order. Exactly. That's the, that's the salient point. I'm glad we're, I just want to make sure we're talking about the same thing. Great. His first statement, uh, Commander Matthews first statement said that he gave specific directions with two conditions. There's, there's a, I think quite a glaring discrepancy between the two statements. Do you want to speak to that? Yeah. You know, if, if we only think that there wasn't a record was ER 806, it's, it sounds like he imposed restrictions. I would agree, but he, he later said after, you know, I don't, I don't understand how the district judge then can resolve that seeming inconsistency without at a minimum, some testimony or some discovery or some sort of basis on which he can then make a factual determination, uh, as opposed to just picking one, uh, of those statements over another, well, here's why. So to be, uh, there are factual issues, but I don't think that they're material here. And I think the district court could properly find on this record that there was no genuine issue, that there wasn't a clear and specific mandatory directive of the kind, um, that would satisfy plaintiff's, uh, the step one inquiry here. So we're in the military, right? As, as was established in the colloquy earlier, chains of command are critical. The military, if, if something is a direct order, it is issued as a direct order, commander does not say, well, I think it would be a good idea for you. I don't know if judge Bastian was in the military or not, but I found that, uh, that the fact that he didn't think that, you know, that it was him, that it was ambiguous, you know, all the, everything about the military is that you have to follow and, you know, you don't ask whether, if it, if it, whether it's ambiguous or not, it's an order and all the fights occur on whether, you know, people get prosecuted for things and they say that we're following an order and that's how we get into it. Right. So I mean, I'm hoping you're not saying that an order by a higher officer in the military doesn't mean it's an order and it's not mandatory. Of course not. And, and, you know, didn't judge Bastian find that? I think you can read his opinion that way, but we're, we're not defending that ground. We're defending the ground. I know you're not, but if it's, but if in fact that's an error that he made, then why doesn't either, and you have to, you know, I'm with judge Kristen in the fact, not because we've talked about it, but we're seeing two different. We're seeing two things that we can't quite put together. A lot can happen in a two year period of time. And a lot of people could have talked to the commander and they could have said things. He could have, you know, maybe the commander went to school on sovereign immunity in the meantime, and they talked about that exemption. And then the declaration sort of morphed along that. If in fact, he was pressure was exerted on him to change what he had to say. That's pretty significant in terms of ascertaining that you can't tell that just looking at the declarations. There there's no basis to conclude that Colonel Matthews and range officer Holman, when they made sworn statements under oath, that there was no enforceable order here where we're lying. We're talking about senior army leadership here. Council. Here's the question. I'm sorry. Here's the question. Actually, I'm not trying to impugn. I don't think we're trying to, I just want to show you, we're not trying to impugn anybody's integrity. And I, and I understand and feel your frustration because we're jumping in and we need to let you answer the question. I think the question is the district court clearly decided that that wasn't it, that it wasn't sufficiently specific, that it was ambiguous. I'm trying to figure out, is that because it was oral? Is that because there was a, you know, Holman said he didn't hear it. Could you just speak to that? What made that, what made the directive insufficiently specific, please? Yes. It's both of the factors you mentioned, and there's a fair amount to talk about here, so, you know, most, although a mandatory directive can be oral, most of the time it's in writing, right? So we're all looking at the same document here. We're trying to reconstruct a conversation that happened over the phone with two and the question is not only what was said, but what. Forgive me. It's hard by Zoom, but just to be clear, to knock these out, is it the government's position that the fact that it was oral, that doesn't make it, that's not a fatal flaw. Is that your position? It's not a fatal flaw, but it's relevant. Okay, go ahead. Because there's an evidentiary judgment has to be made. Ultimately, was there an order conveyed over the phone and Matthews after consulting with Holman later, Matthews is trying to reconstruct what's going on in his head, right? Whether what, and what he thought in his head was actually conveyed as an order. You don't actually, you don't actually preclude anyone's discretion to act unless you communicate the order. If I write a resignation letter, but don't turn it in, I haven't resigned. So too with restricting an inferior's discretion. And what Matthews later said is. I had these restrictions in mind, but I didn't come, I am now satisfied and swearing under oath that that did not result in an enforceable order. And when an army commander knows that he issued an order and someone has been insubordinate, they're not shy about saying so here, you have. Wait a minute. Wait a minute. That's, that's a problem because, because Holman says it's very clear. He's a civilian and he's not subject to discipline. So, so let me back off for that and go back to the point here, which is whether it's ambiguous or why it's ambiguous. And you think that district court could rule as a matter of law. And what you're saying is that putting these statements together, the problem is not that it was oral, but that Holman didn't understand it. It wasn't adequately communicated, clearly communicated. Is that right? Successfully communicated, I should say. That's right. And when, when Colonel Matthews says I didn't, it didn't result in an enforceable order, that's not a question of whether he's liable under the uniform code of military justice. That's a question of whether it was an order, whether it was a dictate as opposed to guidance, talking out loud. Um, Colonel Matthews, any army commander has the decision to completely eliminate the discretion of his subordinate or to allow the subordinate to act in accordance with guidance. And Holman's recollection of the conversation was they had discussed being cognizant of wind speeds as a matter of situational awareness, being cognizant of putting out small fires. Mr. Sandberg, if in fact, just, this is a hypothetical. If in fact, the commander clearly communicated, if you have any brush fires, you have to stop, and that was clearly communicated. Is this, then you're not entitled to the exemption. Is that correct? Yes, that's right. And, and, and another, another point that happened in the same conversation was exactly such a direct order and it was complied with. It was an order that two other brush trucks be parked at range 12, in addition to the equipment that was already there, Holman understood it as an order and he implemented it. And Matthews, after the fact, he's now testifying to what happened in this conversation. He's like, look, I, the things that I, that were clearly mandatory orders, Holman understood and he put into effect, but this was not one of them. This was situational awareness discussion. Okay. I'm, I am sorry. You're, you're, you gotta slow down, Mr. Sandberg. We're, uh, and, and, well, I'm, I'm, we were interrupting you a lot, but you watched the last presidential debate, so we know how it's done. Uh, the, uh, but, um, I want to go back to the very beginning of where you started. If, if I understand it, plaintiffs ask for all sorts of discovery, you say abusive, um, you know, I think it's, um, normal for plaintiffs to ask for everything they could possibly imagine. They, uh, would like to get, um, if I had a, a dollar for every, every overbroad requests from, from, uh, any, but again, I'd be a very rich man, but, but, but let me just finish. And you come back and you don't say, judge, you can decide this, uh, as a matter of law without anything else. You say judge, the proper way to handle this under these circumstances is through an evidentiary hearing, right? But the judge says, no, I'm not going to give them discovery and I'm not going to give you an evidentiary hearing. I think I could decide it. And in your words, make a factual finding just on the basis of what I've been presented with. That seems very unusual. What you said, your honor was, was mostly right in, in reconstructing our position. We thought that the court could rule as a matter of the law on the current record, but we indicated that if the court wanted to hear, wanted to make a credibility finding based on live questioning by Matthews, we would be happy to make them available by video conference to testify. Um, what the plaintiffs were asking for was to, you know, insist that active duty members stationed overseas be flown back to Seattle to sit in the plaintiff's law firm for eight hour depositions. And that was what we couldn't in good conscience agree to, you know, the depositions on the terms that they were ultimately demanding given also their. Understanding of the scope of discovery. And, and the thing that makes this different, there's no question sitting for a deposition is cruel and unusual punishment. And judge you're, you're absolutely right. Plaintiffs ask for everything they can ask for and they, they can, and they should, and that's normal practice. What is not normal practice is to get on the phone with the judge multiple times, have the judge reiterate his understanding of what the scope of jurisdictional discovery is. What's not normal is to have plaintiff's counsel violating the local rules multiple times over. Okay. But, but, but my point is this, and that might've gotten the judges back up. I don't know, but my point is this. There's a disputed critical disputed fact. The plaintiffs take one position. You say it can be decided as a matter of law, but, uh, alternatively we'll, let's have an evidentiary hearing. The judge says, no, we don't need an evidentiary hearing. I can resolve this as a factual matter, just on what I've seen. That seems to me, frankly, highly unusual. If this court concludes it's that that's an abuse of discretion, not to have an evidentiary hearing, and that's the standard review for that, then we, we don't oppose you remanding, but what we urge you to do on any remand is to indicate that the district court, uh, can resolve this by evidentiary hearing. And is it required to force depositions? Is it required to force additional documents? I guess, but if it's on 12B1, we have to, and I know that there are things that can support a 12B1, but if we, but in order for you to prevail on a 12B1, my understanding has to be that there cannot be a material disputed fact and, and all inferences would have to be to the plaintiff you're shaking. That's not correct. Your honor. Um, a judge is allowed on a rule 12B1 motion to make a factual finding of what is true in the world. And that is subject to review for clear error. There's one exception to that. It's the exception that plaintiffs are trying to rely on, which is this court has said that if the jurisdictional fact issue is so intertwined with a merits issue, then you have to apply the summary judgment framework. And if there's genuine issues of material facts, you can't resolve it at 12B1. You have to move forward, but that's not the scenario. I don't know how, since the commander is so crucial to how you resolve whether there's an exemption or not, and the commander has made two different statements, two years apart, and we don't know anything about that. I don't know how, I'm having a hard time figuring out how it doesn't fall within that. Well, it's not inextricably intertwined with the merits because the merits of negligence is an issue of state law. What does Washington hold to be negligent? The issue on 12B1 is an issue of federal law. Was there a mandatory directive issued by Matthews? Again, if this court thinks it was an abuse of discretion not to have an evidentiary hearing, we're not opposed to a remand for an evidentiary hearing. We know what Colonel Matthews is going to say, because it's what he said in his declaration. There was no enforceable order. It was situational awareness discussion. We think that the district court- You know what he's going to say, but if anyone, I went to court for 10 years as a trial lawyer, and I always thought I knew what people were going to say, but when cross-examination comes up, they didn't always say exactly what I thought they were going to say, or that puts different lights on it. So you don't, I guess you hope that they're going to say what they said in their declaration, but it also gives context to it and any influence that could have been exerted in the interim to either change the story or whatever. I mean, that's just trial 101. You know, why do people, why are there inconsistencies? What happened and what were the circumstances under each? That's right. And trial judges are, you know, Judge Bastian is a district court judge. He deals with discovery all the time. In this case, he made the judgment. I don't need to hear from Colonel Matthews by video or sitting in front of me. I am satisfied by his declaration that this conversation did not result in a clear and mandatory directive that eliminated Holman's discretion. It may be useful to bear in mind that if Matthews hadn't retained the ultimate decision-making authority here, the judgment call would have been Holman's. So Matthews is cognizant that by midday, when the winds picked up just a little bit, it was the, the, under the fire matrix, the decision, whether to allow training to go forward was, was, would have been Holman's if Matthews didn't keep it and Holman's actually at the range. Matthews is, is in Tacoma, 150 miles away. And so like part of the context of this is Holman is relaying information to Matthews over the course of the day. Matthews doesn't put a stop to anything. And Matthews is cognizant that this would be Holman's call. If indeed, you know, Matthews hadn't, hadn't, Judge Christin? Yes. I want to ask you a question about that. I have two questions for you. You just said, and I've tracked this just the way you have. He's 150 miles away at McCord on this day. But the first, going back to the first day, you know, this, of course, you know, this record very well. On the, on the first declaration, he says, post-fire after the fact, that's when I got these updates. Right. That's a, that's a separate inconsistency. Is it not? Uh, I'm not, I'm not sure I'm quite following. He, he testified later that he got the declaration. He says he was, and they both say in their declarations two years later that, um, he, that he, uh, Matthews was getting these updates over the course of the day. That's right. Yeah. But in the first statement that Colonel, uh, Commander Matthews made, he said that post-fire, after the fire, he came to learn secondhand that those conditions had been, uh, met. Um, I, I'd have to look back at that statement specifically. Well, okay. We're out of time. So I'm, I'm, I'm looking at it, but it says based on secondhand reporting post-incident, I understand the unit did have smaller fires prior to the large fire and the winds did increase post-fire. So that's why it seems to me so important. That's why I was, and I don't, I don't mean to be giving people a hard time, but we take these cases seriously too, as you do, and we're really digging in and trying to be conscientious. If you look at the second declaration, I'm sorry. I thank you for, for digging in. We're trying. So that's why I was giving opposing counsel a hard time too, so we're not discriminating. It's, we're giving you both a hard time. The second declaration in isolation, right? One would, one would understand very clearly. He not only made the decision to go forward with the training, he retained it over the course of the day. He received the updates and then, and then he concludes, you know, and so, and he's got the discretion and he didn't exercise it. He let it go forward. That's one scenario, very different scenario. Then if you look at the first statement that he made a month later, because in this one, he didn't, he wasn't getting those updates, right? He retained the authority, but he wasn't getting those updates. And it just seems to me a really critical distinction. I'm going to stop because we're way over time. And judge Callahan has been very generous, but I just want to give you a chance. Yeah, well, I want to give you a chance and I promise not to interrupt you. I want to give you a chance to respond to my problem, which you're familiar with. How is it possible? The district court judge could resolve this discrepancy. When he decides, I, as I read his order, he's deciding this, whether it's oral and you've conceded the problem wasn't that it was oral, but that it was, it's not sufficiently specific to support your discretionary function exception, because I think it's because it's ambiguous or wasn't, wasn't successfully communicated. Right. Right. But so, so, so those are two different problems. This statement, I'm looking at ER 806, which is the earlier one, the earliest one he gave, he said, I do not believe he commander commander Matthew said, I do not believe the training unit adhered to my additional specific restrictions for July 30th training to stop once those two conditions were met. So it's not a matter of impugning integrity. It's a matter of witnesses, memories fading. And, you know, closer to the time, of course, we understand that we typically think that the memory is going to be better. He describes his own order as specific on that day. So that's his issue of fact. So, so which we've just talked about is the problem that it wasn't successfully communicated. What makes it ambiguous? Yes. Yes. As a matter of law, even if, uh, Colonel Matthews intended to have the restrictions, if they weren't actually communicated, then he didn't actually remove discretion. That's like the resignation letter example I gave you before, or, you know, imagine Colonel Matthews actually did say out loud, this is a restriction, but the phone cuts out, Holman doesn't even hear it, Holman's discretion has not been, uh, restricted if he didn't actually receive the order, the order has to be both made and received. And I agree with you. There was tension between 806 and, and, and, uh, Holman or sorry, Matthews later statements, but we, our position is, and we thought that the district court could have an evidentiary hearing if it wanted to. We're sort of, we're all in violent agreement on this here. We just think that it wasn't an abusive discretion requiring this court to get involved in the decision about whether an evidentiary hearing should be held or not for the court to make a finding to credit the declaration at page, um, uh, 400 or so, I believe it is rather than the statement at 806. You've got an army. Can you just tell me why not? That's that's, that's the number of it. Why, what, how is the district court judge in the position to credit the later statement over the earlier one, please? Because Matthews reconciled his earlier statement. He's now acting on a fuller understanding of the world. He's, he's, you know, if you and I are trying to reconstruct a conversation we had a while ago, I would consider it quite relevant. What you have to say about what happened in it, informing my own judgment about what we said. And Holman is saying emphatically, these are the orders I got from you. Colonel Matthews, two additional trucks. Got it. Firefighters got it. Um, I did not get any message from you about stopping. If a fire breaks out, I did not get any message from you about stopping. If the wind speeds picked up to either 10 miles per hour or red flag levels, which is 15 miles per hour. And so there's a dispute about even what this alleged restriction was. Um, and Matthews is inconsistent in his recollection of what the wind speed should be for that. So it's, it's, you know, we're the district court is looking at a later declaration that reconciles more information than was available to Colonel Matthews at the time. And we think, you know, the district court could have had a hearing on this, but it didn't need to. And if this court wants to find an abuse of discretion and remand, that's, that's fine, we just would ask that you please give the district court the ability to rein in still the abuse of the discovery requests that were presented to us. Let me ask you while we're going over time, we want to get our questions answered and we'll, we'll give you enough time. Well, you get ready, Mr. Monte, it's coming your way. So, um, the question that I have is there were a couple of other, uh, uh, regulations that, uh, the plaintiff, uh, that they cited saying those were mandatory and took this outside discretion on this record, can we deal if let's just say hypothetically, we said, okay, it was an abuse of discretion, not to have a hearing on, uh, with commander with the commanders, uh, different statements. Uh, can is on this record, can we say, can we rule on the other regulations, whether they are mandatory without having the hearing? Yes, you can. And there's two pieces to that. One is the regulation three 50 dash two, which your honor referred to before, and which I'd be happy to address. If you have questions about the other piece is, um, there were three witness statements made during the investigation by Colonel Kooth. Um, they were by the police chief, by a police officer and by the ammunition's accountable officer. And they said to varying degrees, you know, the police chief said I was under the impression that, uh, training, uh, during red flag conditions wasn't allowed to use tracers, um, you know, the ammunition officer said, I think we should strictly enforce the fire policy, but we didn't say what he thinks that was, um, a few things to bear in mind about that one. None of these people who are making these statements have any responsibility for, um, range safety. Um, the police officer, although they, you put, they perform an important function, no doubt on the base. They're not in charge of deciding whether tracers can be used. They're also giving these statements at a time after the relevant policies have changed in mid August, 2016. Because of this fire, uh, the army said, you know what, for the rest of this fire season, we're not going to use tracers until we can come up with, you know, a policy that we, we like a little bit better. And so two weeks later, when these, when the police officers are making their sort of, well, I was under the impression statement, they're, you know, reacting against potentially knowledge that the rules have changed in the meantime. So we produced in response to the plaintiff's discovery requests, everything that you could find about what was, I guess, if I were to summarize, you're saying we, we could say that that's off the table, but we could have an evidence. We could hypothetically agree that an evidentiary hearing is necessary to resolve, uh, the commander's I, I don't think there's any basis for an evidentiary hearing here. I think my hypothetical, you know, sometimes you're arguing and you're not getting anywhere. I said, hypothetically, we could say we could limit it to the commander. This, this court has the power, the power to order the police chief to say kind of, no, we know that. Okay. Thank you. All right. All right. We're going to go back over to, uh, Ms. DeMonte. All right. I'm going to start you with five minutes on rebuttal. And then if, if we have more questions and just keep answering. Okay. Thank you, your honor. Uh, judge Kristen hit on a critical statement in the witness statement. And there's a sentence actually before that sentence, which I think is also important on ER 806. Where Matthew says, I don't know who made the decision to continue training at range 12 once the conditions were met to stop training. I don't know who made that decision. The inference to be drawn is it wasn't me. I didn't know that those conditions were met and I didn't decide to continue training. Instead, my earlier directive of ceasefire was in operation. And if that wasn't implemented, I don't think that's on commander Matthew. In what other case can a party in order to meet its burden, rely on untested declarations and allow the district court to engage. All right. But, but now that gets to supposing we send it back. Why shouldn't we just limit it to an evidentiary hearing? Um, a limited man, maybe a narrow evidentiary hearing is a 12 B one. Uh, and, uh, the, uh, while the court has the option that district court to, uh, allow limited discovery. I don't know of anything that requires the district court to have limited discovery. What is required is factual determinations. And if you're right, that he was not in a position to make the factual determinations based on this ambiguous at best paper trail, um, the, uh, why shouldn't, uh, we say, uh, uh, we're sending it back, but we're limiting it to a, uh, narrow evidentiary hearing. Well, your honor, there's two reasons why discovery is needed. Uh, and it could happen in the context of an evidentiary hearing, but in terms of the narrowness of it, there were other policies, mandatory policies that are at issue here. Policies about the kinds of equipment that needed to be present, the training, whether there were the prescribed burns and firebreak maintenance happened. And the government never met its burden at step one to show that those were complied with. Uh, on that point, I'll just tell you, and you only have a little time left. So let me just tell you, I do not find those arguments persuasives. What's your strongest argument regarding the policies that you think you were entitled to that you didn't receive? Well, we have the firebreak policy, the fire burn policy, for example. There's also evidence in the record that there were no prescribed fire burns despite, uh, prescribed burns, despite a policy requirement. Counsel, counsel, what's, what's the policy that you think you're entitled to? What's your best shot? Which one? What did you not get? Um, we didn't get discovery on whether those policies were in fact complied with. So that, is that a deposition you want? Yes. Yes, we do need deposition discovery. Additionally, there is evidence in the record of an internal policy against, uh, the use of tracers during the fire season. And okay. I, I, I, I, I, I, I do, I did not find that persuasive. I'm trying to get your strong. You're strong. I'm just giving you a chance. Is it a 30 B six? Whose deposition are you missing? What is it? Yes, we do need a 30 B six of the United States to know what policies and internal policies there were and whether they were complied with as well as, uh, commander Matthews to learn what his restrictions are. And here counsel referred to that, uh, exception. Um, here the issues going to jurisdiction and the merits are overlapping. This case is very much like the Augustine case. We're determining when the, the claim accrued depended on factual determinations about whether the dentist had properly diagnosed and informed him about his condition, which this court said went to the heart of his substantive negligence claim and therefore the jurisdictional issue needed to be resolved, uh, in a way to determination and emotion on the merits or at trial and here to, uh, what a reasonable person would do in these circumstances is dependent on factual issues of, uh, what was the awareness of the restrictions that were in place, the weather conditions, and those go to the merits of the case. So I do think counsel, if, if the evidentiary hearing, let's say hypothetically, after the evidentiary hearing judge Bastian reversed himself and said that they weren't entitled to the exemption, then you're going to have a trial on the negligence issues, right? That's correct. And then what discovery judge Bastian thinks is necessary on the negligence is a whole different issue. So we don't need to, I mean, he would have that authority. If he decided that the exemption didn't save them from trial, then you can go forward, but if we hypothetically think this is what he needs to do to ascertain whether the exemption applies, I mean, we have the authority to do that. And it seems like some of the things you're asking for are things that if you get to go to trial might be perfectly appropriate at that point, but if you don't get to go to trial, you know, but to determine whether you get to go to trial or the exemption, um, you know, I'm a little bit with judge Kristen that you're asking for the kitchen sink, um, too early. Um, well, uh, I appreciate that and, uh, we don't need the kitchen sink if that's not what this court wants to do. But what we do need is, uh, you know, uh, at least a glass of water to be able to, from the kitchen sink, to be able to, uh, meet the government's motion, it's untested declarations and determine, uh, what was said that day and what commander Matthews, uh, said, um, and to probe his untested, uh, statements that, you know, vary. For all those reasons, we'd ask the court to, uh, reverse and remand this matter for further proceedings. If there are no further questions, um, I thank you for your time. Any further questions for my colleagues? No. Okay. But I'd like to thank both counsel for their patience. Yeah, I think you both did. I think you both did a good job. A little less yelling and a little slower speaking, but clearly, but the substance, but substantively you were both strong and I don't think that any of us took it, uh, we didn't take it disrespectfully on others. Those are just, those are just tips, but I think substantively you both clearly have a good command of the record. And in a difficult case, we always appreciate that. So thank you both for your helpful arguments. Thank you. I apologize for hurting your ears. Well, I, I do the same thing to people. People always have, no one ever says they can't hear me. So, uh, I think they hear me more than they want to hear me. So I share that issue. Thank you. All right. Thank you. I'd love to share. And the court has always told me to talk slower. So I, Mr. Sandberg, I'm probably amalgamation of both of the things I'm telling you not to do. I do. It says at the top of my paper, at the top of my paper, speak more slowly. And it's just, it happens when I feel like I'm not able to say what I want to say. I just, it just happens. So I'm sorry. Thank you both. Thank you. All right. Uh, that matter will be submitted.
judges: Callahan, Christen, Rakoff